UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
ALI MOORE,

**DOCKET NO.: 22-CV-10957**

Plaintiff,

JOHN DOES, MOUNT SINAI ST LUKE'S
HOSPITAL, and JOHN DOES, MOUNT
SINAI HEALTH SYSTEM, and JOHN DOES,
JAMES AARONSON

-against

CITY OF NEW YORK, NEW YORK, NEW
YORK POLICE DEPARTMENT , POLICE
OFFICER 718, POLICE  OFFICER
SERGEANT MONTESINO, POLICE
OFFICER ANTONIO CASTELLUCCIO, in a
collective  capacity, NEW YORK CITY
POLICE  OFFICER SANJAY BAJNAUTH, in
a collective  capacity, NEW YORK CITY
POLICE SGT.  DAVID S. MALDONADO, in a
collective  capacity, NEW YORK CITY
POLICE OFFICER DAVID  CASTRO, in a
collective  capacity, NEW  YORK CITY
POLICE OFFICER NILSA PATRICIO, in a
collective  capacity, NEW YORK CITY
POLICE OFFICER JOHN DOES #1-10
(fictitiously  named), in a collective capacity,
NEW  YORK CITY FIRE DEPARTMENT
EMT/EMS ROSAS #2679, in a collective
capacity, NEW YORK  CITY FIRE
DEPARTMENT EMT/EMS VASQUEZ, in a
collective  capacity, NEW YORK CITY FIRE
DEPARTMENT EMS/EMT JOHN DOES
#21-30 (fictitiously named), in a collective
capacity, NEW YORK CITY HEALTH +
HOSPITALS,  NEW YORK CITY HEALTH +
HOSPITALS JOHN  DOES #31-40 (fictitiously
named), in a collective capacity, DOCTOR
NURUR RAHAM, in a collective capacity,
DOCTOR KALU AGWU,  in a collective
capacity, DOCTOR RYAN H.  HASHE, in a
collective capacity, DOCTOR GAUTAM
BALASUBRAMANIA, in a collective
capacity, HARLEM HOSPITAL, and,  KAREN
EUBANKS,EARL MOORE, RALPH St JOHN
HARLEM  HOSPITAL JOHN DOES #41-50
(fictitiously named), in a collective
capacityMORNINGSIDE HEIGHTS
HOUSING CORPORATIONS, and JOHN
DOES,  FIRSTSERVICE RESIDENTIAL, and

Defendants.

------------------------------------------------------------

**FIRST AMENDED FOURTH AMENDED**
**FOURTEENTH AMENDED**
**AMENDED COMPLAINT**                    **FEDERAL QUESTION/DIVERSITY CITIZ**

**JURY TRIAL DEMANDED**

Plaintiff ALI MOORE,,   complaining of Defendants CITY OF NEW YORK, NEW YORK

CITY DEPARTMENT AND POLICE OFFICER

1

Case 1:22-cv-10957-LGS Document 25 Filed 03/29/23 Page 2 of 37

ANTONIO CASTELLUCCIO, in a collective capacity, NEW YORK CITY  POLICE OFFICER

MALDONADO, in a collective capacity, NEW YORK CITY POLICE OFFICER DAVID CASTRO, in a collective capacity, NEW YORK CITY POLICE OFFICER NILSA PATRICIO, in a collective capacity,

NEW YORK CITY POLICE OFFICER JOHN DOES #1-10 (fictitiously named), in a collective capacity, NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679, in a collective capacity, NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, in a collective capacity, NEW YORK CITY FIRE DEPARTMENT EMS/EMT JOHN DOES #21-30 (fictitiously named), in a collective capacity, NEW YORK CITY HEALTH + HOSPITALS, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40 (fictitiously named), in a collective capacity, DOCTOR NURUR RAHAM, in a collective capacity, DOCTOR KALU AGWU, in a collective capacity, DOCTOR RYAN H. HASHE, in a collective capacity, DOCTOR GAUTAM BALASUBRAMANIA, in a collective capacity, HARLEM HOSPITAL, and HARLEM HOSPITAL JOHN DOES #41-50 (fictitiously named), in a collective capacity, alleges as follows:

## **PRELIMINARY STATEMENT**

1. This is a civil rights action in which Plaintiff, ALI MOORE ("MOORE" or "Plaintiff") seeks relief from Defendants CITY OF NEW YORK, NEW YORK CITY POLICE OFFICER ANTONIO CASTELLUCCIO, in a collective capacity, NEW YORK CITY POLICE OFFICER SANJAY BAJNAUTH, in a collective capacity, NEW YORK CITY POLICE SGT. DAVID S. MALDONADO, in a collective capacity,

2

NEW YORK CITY POLICE OFFICER DAVID CASTRO, in a collective capacity, NEW YORK CITY POLICE OFFICER NILSA PATRICIO, in her collective capacity NEW YORK CITY POLICE OFFICER JOHN DOES #1-10 (fictitiously named), in a collective capacity, NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679, in a collective capacity, NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, in his collective capacity, NEW YORK CITY FIRE DEPARTMENT EMS/EMT JOHN DOES #21-30 (fictitiously named), in a collective capacity, NEW YORK CITY HEALTH + HOSPITALS, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40 (fictitiously named), in a collective capacity, DOCTOR NURUR RAHAM, in a collective capacity DOCTOR KALU AGWU, in his collective capacity, DOCTOR RYAN H. HASHE, in his collective capacity, DOCTOR GAUTAM BALASUBRAMANIA, in a collective capacity, HARLEM HOSPITAL, and HARLEM HOSPITAL JOHN DOES #41-50 (fictitiously named), in a collective capacity, (hereinafter, collectively referred to as "Defendants"), for committing acts violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 , The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourteenth Amendment and acting under color of state law acts under color of law and depriving Plaintiff of rights secured under 42 USC § 1983 grounded in rights secured to him under the Fourth and Fourteenth Amendments to the Constitution of the United States.

2. Plaintiff alleges that Defendants engaged in unlawful conduct including assault, battery, false arrest, abuse of process, excessive force, intentional infliction of emotional distress, and negligent infliction of emotional distress. All acts were committed under the color of law and deprived Plaintiff of rights secured to him under the Fourth and Fourteenth Amendments of the Constitution of the United State and the State of New York.

3. Plaintiff alleges that Defendants failed to address either the assault or the abuses that arose from the same that Plaintiff suffered at the hands of Defendants. Plaintiff was wrongfully arrested, seized, harassed, threatened, assaulted and battered, detained, abused, set out to public ridicule, and made to suffer injury to his good name, his personage, and his mental state of mind, without reason, legal basis, or justification by Defendants.

4. Defendants NEW YORK CITY POLICE OFFICER ANTONIO CASTELLUCCIO, NEW YORK CITY POLICE OFFICER SANJAY BAJNAUTH, NEW YORK CITY POLICE SGT. DAVID S. MALDONADO, NEW YORK CITY POLICE OFFICER DAVID CASTRO, NEW YORK CITY POLICE OFFICER NILSA PATRICIO, NEW YORK CITY POLICE OFFICER JOHN DOES #1-10, NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679, NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, NEW YORK CITY FIRE DEPARTMENT EMS/EMT JOHN DOES #21-30, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40, DOCTOR NURUR RAHAM, DOCTOR KALU AGWU, DOCTOR RYAN H. HASHE, DOCTOR GAUTAM BALASUBRAMANIA, and HARLEM HOSPITAL JOHN DOES #41-50, without justification or any reason except an intent to deprive Plaintiff of his rights and knowledge that their conduct had the tacit authorization of CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY FIRE DEPARTMENT, NEW YORK CITY HEALTH + HOSPITALS, and HARLEM HOSPITAL, wrongfully arrested, seized, harassed, threatened, assaulted and battered, detained and abused Plaintiff. Said use of unlawful conduct upon Plaintiff deprived him of his civil and Constitutional

5. Plaintiff seeks damages, both compensatory and punitive, award of costs, interest and attorney's fees, and such other and further relief as this Court deems just and equitable.

4

## JURISDICTION

6. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments of the United States Constitution. Jurisdiction is conferred upon this Court by 42 U.S.C. § 1983 and by 28 U.S.C. §§ 1331 and 1343(3) and (4) of the aforementioned constitutional provisions. Including The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964, The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourteenth Amendment for a second time

## VENUE

Venue, while suitable, is preferably set at the Edward A. Garmatz United States District Courthouse in Baltimore, Maryland, in accordance with 28 U.S.C. § 1391(b). This choice is informed by the fact that all the events and omissions forming the basis of the Plaintiff's claims transpired within the City of New York, the very locus of employment for all individuals involved. It is imperative to note that such occurrences have recurred numerous times in the State of New York, regrettably without reaching a resolution.

**THE PARTIES**

8. Plaintiff is a resident of the United States who lives in the City of Baltimore, State  of Maryland.

Earl Moore possibly  Violated  The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment  and under color of state law,  including the Civil Rights Act of 1968.

JAMES AARONSON possiblyViolated  The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment  and under color of state law,  including the Civil Rights Act of 1968.

RALPH St JOHN possiblyViolated  The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment  and under color of state law,  including the Civil Rights Act of 1968.

Upon information and belief, at all relevant times described herein, Defendant  CITY OF NEW  YORK  (hereinafter,  referred  to  as  "CITY")  was  and  continues  to  be  a  municipal corporation organized and existing by virtue of the laws of the State of New York.

Upon information and belief, at all relevant times described herein, Defendant  CITY, by its agents and/or employees, operated, maintained, and controlled the Mount Sinai St Lukes,

Upon information and belief, at all relevant times described herein, Mount Sinai St Luke's (hereinafter, referred to as "MSSLH") is a subdivision and/or agency of Defendant CITY and has an office at 1111 Amsterdam Avenue New York, NY 10025 United States

Upon information and belief, at all relevant times described herein, Defendant Mount Sinai St Lukes and John Does ) is hospital staff and doctors who are being sued in a collective capacity and is an employees of Defendants CITY and Mount Sinai St Lukes. At all relevant times described herein, John Does was Violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourteenth Amendments, The Civil Rights Act of 1968. and acting under color of state law, within the scope of their employment as a Hospital staff employed by Defendants CITY and Mount Sinai St Lukes, and works under the supervision, direction, and/or control of their supervisors in Mount Sinai St Lukes.

Upon information and belief, at all relevant times described herein, Defendant CITY OF NEW YORK (hereinafter, referred to as "CITY") was and continues to be a municipal corporation organized and existing by virtue of the laws of the State of New York.

Upon information and belief, at all relevant times described herein, Defendant CITY, by its agents and/or employees, operated, maintained, and controlled the Mount Sinai Health System, including all Hospital staff.

Upon information and belief, at all relevant times described herein, Mount Sinai St

Luke Asher Bator, Plaintiff, In his submission Filed or 09/25/23 of his grand on CITY and has an office at Mount Sinai Health System 150 East 42nd Street New York, NY 10017 United States

Upon information and belief, at all relevant times described herein, Defendant Mount Sinai Health System and John Does ) is hospital staff and doctors who are being sued in a collective capacity and is an employees of Defendants CITY and Mount Sinai Health System. At all relevant times described herein, John Does was Violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and under color of state law within the scope of their employment as a Hospital staff employed by Defendants CITY and Mount Sinai Health System, and works under the supervision, direction, and/or control of their supervisors in Mount Sinai Health System.

Morningside heights housing corporations and John Does Violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and under color of state law

Morningside Heights Housing corporations located 80 Lasalle St New York City, New York

Firstservice residential Manges Morningside Heights and I am suing them and John Does for Violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United

State sanction. The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968  and under color of state law

Firstservice residential Manges Morningside Heights  Housing Corporations and they are located at 2950 N 28th Terrace, Hollywood, FL 33020

Karen Eubanks is being sued for Violating  The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968  and under color of state law. Yes she is my mother


Karen Eubanks is a resident who lives there at 70 Lasalle st apt 10D New York, New York

9. Upon information and belief, at all relevant times described herein, Defendant  CITY OF NEW YORK (hereinafter, referred to as "CITY") was and continues to be a municipal corporation organized and existing by virtue of the laws of the State of New York.

10. Upon information and belief, at all relevant times described herein, Defendant  CITY, by its agents and/or employees, operated, maintained, and controlled the NEW YORK CITY POLICE DEPARTMENT, including all police officers thereof.

5

11. Upon information and belief, at all relevant times described herein, NEW YORK CITY

Defendant CITY and has an office at One Police Plaza, New York, New York 10038.

12. Upon information and belief, at all relevant times described herein, Defendant NEW YORK CITY POLICE OFFICER ANTONIO CASTELLUCCIO ("CATELLUCCIO") is a police officer who is being sued in a collective capacity and is an employee of Defendants CITY and NYPD. At all relevant times described herein, CASTELLUCCIO was violating The Civil Rights Act of 1866, civil Rights Act of 1871 (also known as the Ku Klux Klan Act), Civil Rights Act of 1964 , The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and acting under color of state law within the scope of his employment as a police officer employed by Defendants CITY and NYPD, and works under the supervision, direction, and/or control of his supervisors in the NYPD.

13. Upon information and belief, at all relevant times described herein, Defendant NEW YORK CITY POLICE OFFICER SANJAY BAJNAUTH ("BAJNAUTH") is a police officer who is being sued in a collective capacity and is an employee of Defendants CITY and NYPD. At all relevant times described herein, BAJNAUTH was violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 , The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and acting under color of state law within the scope of his employment as a police officer employed by Defendants CITY and NYPD, and works under the supervision, direction, and/or control of his supervisors in the NYPD.

14. Upon information and belief, at all relevant times described herein, Defendant NEW YORK CITY POLICE NEW YORK CITY POLICE SGT. DAVID S. MALDONADO ("MALDONADO") is a sergeant who is being sued in a collective capacity and is an employee

violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux

Klan Act), The Civil Rights Act of 1964 ,The Fourteenth Amendment to the United States

Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of

1968  and  acting under color of state law within the scope of his employment as a

6

sergeant employed by Defendants CITY and NYPD, and works under the supervision, direction,

and/or control of his supervisors in the NYPD.

15. Upon information and belief, at all relevant times described herein, Defendant  NEW

YORK CITY POLICE OFFICER DAVID CASTRO ("CASTRO") is a police officer who  is

being sued in a collective capacity and is an employee of Defendants CITY and  NYPD. At all

relevant times described herein, CASTRO was violating The Civil Rights Act of 1866, The Civil

Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 ,The

Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth

Amendment, 8th Amendment, The Civil Rights Act of 1968 and  acting under color of state law

within  the scope of his employment as a police officer employed by Defendants CITY and

NYPD, and  works under the supervision, direction, and/or control of his supervisors in the

NYPD.

16. Upon information and belief, at all relevant times described herein, Defendant  NEW

YORK CITY POLICE OFFICER NILSA PATRICIO ("PATRICIO") is a police officer  who is

being sued in a collective capacity and as an employee of defendants CITY. At all relevant times described herein, CASTRO was violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964, The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968  and  acting under color of state law within the scope of his employment as a police officer employed by Defendants CITY and NYPD,   and works under the supervision, direction, and/or control of his supervisors in the NYPD.

17. Upon information and belief, at all relevant times described herein, Defendant  NEW YORK CITY POLICE OFFICER JOHN DOES #1-10 ("DOES #1-10") (fictitiously  named), are employees of CITY with an actual place of employment within the  City of New York, State of New York.

18. Upon information and belief, at all relevant times described herein, Defendant  DOES #1-10 were acting within the scope of their employment as City of New York Police  Officers. Defendant DOES #1-10 are being sued in a collective capacity.

7

19. Upon information and belief, at all relevant times described herein, Defendant  CITY, by its agents and/or employees, operated, maintained, and controlled the NEW YORK  CITY FIRE DEPARTMENT, including all EMT/EMS personnel thereof.

20. Upon information and belief, at all relevant times described herein, Defendant NEW YORK CITY FIRE DEPARTMENT (hereinafter, referred to as "FDNY") is a subdivision and/or agency of Defendant CITY and has an office at 9 Metrotech Center, Brooklyn, New York 11201.

20. Upon information and belief, at all relevant times described herein, Defendant NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679 ("ROSAS") is an EMS/EMT who is being sued in a collective capacity and is an employee of Defendants CITY and FDNY. At all relevant times described herein, ROSAS was violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and acting under color of state law within the scope of his employment as a police officer employed by Defendants CITY and FDNY, and works under the supervision, direction, and/or control of his supervisors in the FDNY.

21. Upon information and belief, at all relevant times described herein, Defendant NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ ("VASQUEZ") is an EMS/EMT who is being sued in a collective capacity and is an employee of Defendants CITY and FDNY. At all relevant times described herein, ROSAS was violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and acting under color of state law within the scope of his employment as a police officer employed by Defendants CITY and FDNY, and works under the supervision, direction, and/or control of his supervisors in the FDNY.

22. Upon information and belief, at all relevant times described herein, Defendant NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, NEW YORK CITY FIRE

DEPARTMENT EMS/EMT JOHN DOES #21-30 ("DOES #21-30") (fictitiously named), are employees of CITY with an actual place of employment within the City of New York, State of New York.

23. Upon information and belief, at all relevant times described herein, Defendant DOES #21-30 were acting within the scope of their employment as FDNY members. Defendant DOES #21-30 are being sued in a collective capacity.

24. Upon information and belief, at all relevant times described herein, Defendant CITY, by its agents and/or employees, operated, maintained, and controlled the NEW YORK CITY HEALTH + HOSPITALS ("NYCHH"), including all employees thereof.

25. Upon information and belief, at all relevant times described herein, Defendant NYCHH is a subdivision and/or agency of Defendant CITY and has an office at 50 Water Street, New York, New York 10004.

26. Upon information and belief, at all relevant times described herein, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40 ("DOES #31-40") (fictitiously named), are employees of CITY with an actual place of employment within the City of New York, State of New York.

27. Upon information and belief, at all relevant times described herein, Defendant DOES #31-40 were acting within the scope of their employment as NYCHH employees. Defendant DOES #31-40 are being sued in a collective capacity.

28. Upon information and belief, at all relevant times described herein, Defendant

and is an employee of Defendants CITY and NYCHH and HARLEM HOSPITAL
("HARLEM"). At all relevant times described herein, RAHAM was violating The Civil Rights
Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil
Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in
1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and acting under
color of state

law within the scope of his employment as a doctor employed by Defendants CITY and NYCHH
and HARLEM, and works under the supervision, direction, and/or control of his supervisors in
the NYCHH and HARLEM.

29. Upon information and belief, at all relevant times described herein, Defendant
DOCTOR KALU AGWU ("AGWU") is a doctor who is being sued in a collective capacity and
is an employee of Defendants CITY and NYCHH and HARLEM. At all relevant times described
herein, AGWU was violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also
known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment
to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment,
The Civil Rights Act of 1968 and acting under color of state law within the scope of his
employment as a doctor employed by Defendants CITY and NYCHH and HARLEM, and works
under the supervision, direction, and/or control of his supervisors in the NYCHH and HARLEM.

30. Upon information and belief, at all relevant times described herein, Defendant

DOCTOR RYAN HASHE ("HASHE") is a doctor who is being sued in a collective capacity and is an employee of Defendants CITY and NYCHH and HARLEM. At all relevant times described herein, HASHE was violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and acting under color of state law within the scope of his employment as a doctor employed by Defendants CITY and NYCHH and HARLEM, and works under the supervision, direction, and/or control of his supervisors in the NYCHH and HARLEM.

31. Upon information and belief, at all relevant times described herein, Defendant DOCTOR GAUTAM BALASUBRAMANIA ("BALASUBRAMANIA") is a doctor who is being sued in a collective capacity and is an employee of Defendants CITY and NYCHH and HARLEM. At all relevant times described herein, BALASUBRAMANIA was violating The Civil Rights Act of 1866, The Civil Rights Act of 1871 (also known as the Ku Klux Klan Act), The Civil Rights Act of 1964 and The Fourteenth Amendment to the United States Constitution: Ratified in 1868, The Fourth Amendment, 8th Amendment, The Civil Rights Act of 1968 and acting under color of state law within the scope of his employment as a doctor employed by Defendants CITY

and NYCHH and HARLEM, and works under the supervision, direction, and/or control of his supervisors in the NYCHH and HARLEM.

32. Upon information and belief, at all relevant times described herein, Defendant CITY and/or NYCHH, by its agents and/or employees, operated, maintained, and controlled HARLEM, including all employees thereof.

33. Upon information and belief, at all relevant times described herein, Defendant HARLEM is a subdivision and/or agency of Defendant CITY and/or NYCHH and has an office at 506 Lenox Avenue, New York, New York 10037.

34. Upon information and belief, at all relevant times described herein, Defendant DOES #41-50 (fictitiously named), are employees of CITY and/or NYCHH with an actual place of employment within the City of New York, State of New York.

35. Upon information and belief, at all relevant times described herein, Defendant DOES #41-50 were acting within the scope of their employment as NYCHH and/or HARLEM employees. Defendant DOES #41-50 are being sued in a collective capacity.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW 36.

Plaintiff served a Notice of Claim upon CITY on December 28, 2021, within ninety days of the events giving rise to his claims.

37. On June 10, 2022, MOORE appeared for an examination pursuant to §50-h of the New York General Municipal Law.

38. More than thirty days have elapsed since Plaintiff served his Notice of Claim and the CITY has not offered adjustment or payment thereof.

39. Plaintiff served a Notice of Claim upon NYCHH and HARLEM on December 28, 2021, within ninety days of the events giving rise to his claims.

40. On February 24, 2022, MOORE appeared for an examination pursuant to §50-h of the New York General Municipal Law. The 50Hs are off and they did not include everything and my former attorney did not go over them with me. Like I asked him and more. He also did not return all the 50Hs nor did he give proper legal advice. Also I believe he was giving information to the opposing party based on how the 50H. Setting me up to be held with contempt in court. Also Mr Pablo Fernandez is the same Racial ethnic group or language group as the defendants. Mr. Shapiro did not give proper legal advice before the second 50H with the NYPD, that's why

the Claim 1:22-cv-10957-LGS-RWL were communication such as impersonating law firm attorneys not being a part of the  50H saying "BS" while the 50H was happening out loud. Mr Pablo kept rubbing His head during the 50H. The Bee Reporting Agency INC did not report everything  said in the 50H - foul play.  Mr Pablo Fernandez  did not  tell me, I  had 30 days to  make corrections after everything was notarized. He did not read over 50H with me when I  asked him.  The opposing attorney was supposed to return my things, they did not include that in the 50H.  The second 50H with Mr Shapiro was used not to give proper legal advice and for me to make an error.  Mr Pablo Fernandez said on the first day we met at his law firm that we would have everything settled by December 2022. He filed in federal court on December 28, 2022 through his assistant. They did not send me a copy of the complaint until April 2023 after he filed -  This  complaint is a different complaint - It's not the same complaint, this is about race. I believe he was communicating with Morningside Gardens because of the information I sent him. He was supposed to include them in the lawsuit he didn't.  I doubt he didn't  send a subpoena for video evidence. I doubt the building complex held the video evidence after I told them to do so. Probably because of the high social status of the  indivisibles who live in building complex. Everyone in  Morningside gardens has been doing the switch up.  Also Pablo waited until the policies were passed in November 2022  after we had the 50H.  It was very Obvious  after our conversations during March and April.  Also he did not want me to file my complaint on my own on events that happened with the same police precinct  on February 11, 2020 - He didn't want to handle the case. Over the same  matter, that's another lawsuit with him.  The rumors are true about New York State, it's a rogue state.

41. More than thirty days have elapsed since Plaintiff served his Notice of Claim and  the CITY has not offered adjustment or payment thereof

## FACTUAL ALLEGATIONS

42. Plaintiff MOORE was 28 years old at the time of incident. Plaintiff MOORE has  been Misdiagnosed.. I was falsely admitted on October 6 2015 at Harlem hospital, close to the same time as Ms Kam Brock who was misdiagnosed of  having bipolar disorder. who came out publicly on Pix 11  and was sexly assaulted by hospital staff too.  I was falsely  imprisoned in the month of July 2018 at New York Presbyterian Hospital and Mount  Sinai St Saint Luke's Hospital on February, 11, 2020.  Mount Sinai St Lukes discharged me with know problems  but I believe they changed my records recently.     43. Prior to the underlying incident hereof, Defendants DOES #1-10, DOES #11-20,  DOES #21-30, DOES #31-40, and DOES #41-50 (hereinafter, collectively referred to as  "Defendant DOES") had previously responded to calls involving Plaintiff and were aware of the Misdiagnosed from October 6, 2015 at Harlem Hospital because of my Medical records where on my bed . When NYPD False arrested me on February 11, 2020 in my Room and took me to Mount Sinai St Lukes.

**October 1, 2021, Incident**

44. On or about October 1, 2021, MOORE was present outside the building to his then residence located at 70 LaSalle Street, New York, New York.

45. Sometime on or about October 1, 2021, upon information and belief, employees to Morningside Heights Housing ("Morningside") contacted NYPD because  Plaintiff was causing a disturbance. In truth, Plaintiff was attempting to file a complaint with  Morningside Heights Housing management employees, but these employees were refusing to take Plaintiff's complaint against Montovo and Gilmore - peace officers of  Morningside Heights Housing Corporation.

46. Upon information and belief, Morningside Heights Housing Corporation then contacted 911 emergency services.

47. Sometime after the 911 call, Defendants CASTELLUCIO, MALDONADO and DOES #1-10 arrived at 70 LaSalle Street, New York, New York.

48. At the time Defendants CASTELLUCIO, MALDONADO and DOES #1-10  arrived, MOORE was lawfully present outside the apartment building in which he resided.

12

49. At the time Defendants CASTELLUCIO, MALDONADO and DOES #1-10 came into contact with MOORE, he was not a threat to himself or anyone else.

50. Defendants CASTELLUCIO, MALDONADO and DOES #1-10, inquired if  Plaintiff was Ali Moore. Plaintiff responded in the affirmative and told them he did not want to  speak with them.

51. Immediately upon confirming his identity, Defendants CASTELLUCIO, MALDONADO and DOES #1-10 surrounded him, forcibly grabbed MOORE and placed him in handcuffs. Defendants CASTELLUCIO, MALDONADO and DOES #1-10 purposely  over tighten the handcuffs leaving marks and injuries upon MOORE's wrists.

52. MOORE requested that Defendants CASTELLUCIO, MALDONADO and DOES #1-10 loosen the handcuffs but they refused and made the handcuffs tighter. 53. At some point, Defendants CASTELLUCIO, MALDONADO and DOES #1-10  requested that an ambulance be dispatched to 70 LaSalle Street, New York, New York.  54. Upon information, Defendant ROSAS

any crime or violation of law. 56. At no time, on October 1, 2021, did Defendants CASTELLUCIO, MALDONADO and DOES #1-10 possess probable cause to arrest MOORE.

57. At no time, on October 1, 2021, did Defendants CASTELLUCIO, MALDONADO and DOES #1-10 possess information that would lad a reasonable officer to believe probable cause existed to arrest MOORE.

58. At no time, on October 5, 2021, did MOORE present a danger to himself or any other individual upon the premises.

13

59. Despite MOORE's protestations and that he was not a danger to himself or others, MOORE was forcibly held with handcuffs on at the building complex until the ambulance arrived.

60. At all relevant times, Plaintiff did not display any weapons nor threaten use of a weapon nor threaten use of force. In front of officers or employees at Morningside Heights Housing Corporation including areas near them. I had no ill intent on October 1, 2021 - it sept for getting people fired.

61. While Defendants CASTELLUCIO, MALDONADO and DOES #1-10 waited for an ambulance to arrive, Defendants CASTELLUCIO, MALDONADO and DOES #1-10, without MOORE's consent, searched MOORE's personal belongings.

62. MOORE was accosted, handcuffed and tortured by NYPD much to MOORE's

emblems in an unlawful manner, while his neighbors were looking at him as a result of

Defendants CASTELLUCIO, MALDONADO and DOES #1-10's use of unlawful force,

Plaintiff was caused to suffer severe injuries and extreme severe pain and discomfort.

64. Upon the ambulance arriving, Defendants CASTELLUCIO, MALDONADO and

DOES #1-10 forcibly held MOORE as they dragged and pushed MOORE to the ambulance by

his handcuffs. MOORE was then taken to Harlem Hospital by Defendants CASTELLUCIO,

MALDONADO, DOES #1-10, ROSAS and DOES #21-30.

65. Once at Harlem Hospital, MOORE requested to be release, upon information and

belief, MOORE, while in triage, was told by DOES #31-40, KEMP THANE HERZBER, and/or

DOES #41-50 that he was not permitted to leave and would be held at Harlem Hospital for a

"psych evaluation" even though MOORE was neither a danger to himself nor others.

66. Thereafter, no less than three DOES #31-40 grabbed MOORE, grabbed his arms

behind his back, then lifted MOORE by his pants with his head towards the floor and dragged

him to Harlem Hospital's emergency psychiatric department.

67. Upon entering the Harlem Hospital's emergency psychiatric department, DOES

#31-40, dropped MOORE to the floor faced down, pinned MOORE to the floor causing him to be

choked, and pulling his arms behind his back.

68. Despite MOORE cooperating, Defendants DOES #31-40 used unnecessary and

excessive physical force against MOORE causing him serious injuries and were in paras. 31-

40 further threatened to have MOORE medicated.

69. MOORE was then taken into a room where he was forced to strip to his underwear and forced to wear a hospital gown and socks.

70. MOORE was kept in Harlem Hospital's psychiatric unit against his will. That first night, MOORE had to sleep in a plastic chair.

71. Plaintiff was admitted to Harlem Hospital without his consent.

72. Doctors NURUR RAHAM, KALU AGWU, RYAN H. HASHE, and GAUTAM BALASUBRAMANIA were designated Plaintiff's attending physicians.

73. Upon information and belief, Doctors NURUR RAHAM, KALU AGWU, RYAN  H. HASHE, and GAUTAM BALASUBRAMANIA all conducted psychological evaluations of  the Plaintiff - without my consent and they asked to draw blood too.

74. All four doctors issued reports and/or recommendations that were the direct cause  of MOORE's continued confinement at Harlem Hospital.

75. As a result of the Defendant's conduct, plaintiff remained confined to Harlem Hospital, against his will, until on or about October 2, 2021.

15

76. To avoid further abuse at Defendant HARLEM, MOORE left the hospital to get a second opinion from St. Luke's Hospital, after which he went to stay with his father in Brooklyn.

77. On or about October 3rd or 4th, MOORE returned to HARLEM with his father in  order to

returned his belongings to MOORE including his cell phone and his keys. Supposedly, HARLEM could not find his clothes and/or his bag.

78. At no time did Defendants possess the authority or privilege to keep MOORE confined against his will, nor did the Defendants possess the authority or privilege to provide any treatment to Plaintiff.

79. Defendants' assessments of MOORE's mental health status deviated from inappropriate and unaccepted standards of care for medical professionals. Defendants' treatment of MOORE deviated from inappropriate and un accepted standards of care by medical professionals.

80. Defendants failed in exercising the appropriate level of medical judgment. 81. As a result of the foregoing, MOORE sustained, *inter alia*, an unwanted and unwarranted intrusion on his personal integrity, loss of liberty, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of his constitutional rights. 82. All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

83. All of the aforementioned acts deprived MOORE of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States of America and were therefore in violation of 42 U.S.C. §1983.

84. The acts complained of were carried out by the aforementioned  Defendants in their official capacities with all the actual and/or apparent authority attendant  thereto.

85.  The acts  complained  of  were  carried  out  by  the  aforementioned  individual Defendants in their official capacities pursuant to the customs, usages, practices, procedures, and rules of CITY and NYCHH, all under the supervision of ranking officers of said department.

86. Defendants, collectively and  , while acting under color of state law,  engaged in conduct which constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States. **October 5, 2021, Incident**

87. On or about October 5, 2021, MOORE was present at his then residence located at  70 LaSalle Street, New York, New York.

88. Sometime on or about October 5, 2021, upon information and belief, an unknown individual from Morningside contacted 911 emergency services again -  Morningside Heights Housing Corporation, peace officers most likely.

89. MOORE was alone and lawfully present at his then residence located at 70 LaSalle Street, New York, New York. MOORE was not a danger to himself or others.  90. MOORE was inside his apartment.

91.  Upon  information  and  belief,  Defendants  CASTRO,  PATRICIO,  DOES  #1-10, VASQUEZ and DOES #21-30 without probable cause or reason to believe that a crime had been committed or reason to believe that Plaintiff as a danger to himself or others, unlawfully entered Plaintiff's  apartment,  and  most  likely  did  a  unlawfully  searched  of  Plaintiffs  property  like February 11,2020 , Harassed Plaintiff, and used intimidations on Plaintiff stead using handcuffs like last  times before October 5,2021.

92. Upon information and belief, Defendants CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #21-30 entered MOORE'S apartment without his permission nor consent of grandmother.

93. MOORE was placed in fear for his life and informed Defendants CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #21-30 that what they were doing was not according to protocol and demanded that they leave the apartment.

94. Defendants CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #21-30 told MOORE that they were not going to leave his apartment unless he came with them. 95. Fearing for his life and not wanting the situation to escalate further, MOORE left his apartment with the Defendants CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #21-30.

96. MOORE was taken to St. Luke's Hospital and discharged within an hour. 97. At all relevant times to the instant Complaint, Defendants CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #21-30, separately and in concert, engaged in acts or omissions which constituted deprivation of the Constitutional rights, privileges, and immunities of Plaintiff MOORE and, while these acts were carried out under color of law, they had no justification or excuse in law and were instead gratuitous, illegal, improper, and unrelated to any activity in which law enforcement officers may appropriately and legally engage in the course of protecting persons and property ensuring civil order.

98. At all relevant times to the instant Complaint, Defendants CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #21-30, and each of them, had the power and duty to restrain the other Defendants and prevent them from violating the law and the rights of Plaintiff MOORE, but each of the Defendants failed and refused to restrain the other Defendants and thereby became a party to unlawfully subjecting Plaintiff MOORE to harm and denial of basic rights.

18

99. That the injuries Plaintiff suffered were caused solely by the conduct of Defendants CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #21-30 and Plaintiff in no way contributed to or caused the injuries he suffered.

100. The conduct of Defendants was the proximate cause of Plaintiff's injuries. 101.

The injuries suffered by Plaintiff are permanent in nature.


**A Custom, Policy, and Practice of Failing to Properly Handle Black Freemen**

"Black freemen" specifically refers to a historical context in the United States, particularly during periods of slavery and its aftermath. The use of the term "freemen" typically denotes formerly enslaved individuals who gained their freedom.


During those times, there were indeed customs, policies, and practices that resulted in the mistreatment, discrimination, and denial of rights for Black freemen. These practices were rooted in systemic racism and were prevalent in various areas, including employment, housing, education, and the legal system. Some examples include:


Segregation and Jim Crow laws: Following the abolition of slavery, Black freemen faced widespread segregation and the implementation of laws that enforced racial

discrimination, such as Jim Crow laws. These laws mandated racial segregation and limited the rights and opportunities available to Black individuals.

Discrimination in employment and housing: Black freemen often encountered discriminatory practices when seeking employment or housing. They faced restricted job opportunities, lower wages, and limited access to affordable and quality housing due to systemic racism and bias.

Unequal treatment in the legal system: Black freemen experienced significant disparities in the criminal justice system, including biased arrests, unfair trials, and harsher sentences compared to their white counterparts. They often faced institutionalized racism and systemic biases that violated their rights and undermined equal justice.

Voter suppression: Black freemen faced various tactics aimed at suppressing their voting rights, including poll taxes, literacy tests, and other forms of voter intimidation and discrimination. These measures were designed to prevent Black individuals from participating in the political process and exercising their democratic rights.

Addressing the historical and systemic failures in handling Black freemen required significant civil rights movements, legislative reforms, and court decisions that challenged and dismantled these discriminatory customs, policies, and practices. The struggle for civil rights and racial equality in the United States continues to this day, as efforts to combat systemic racism persist. It's important to remember that while progress has been made, the legacy of these historical injustices continues to impact communities of color today. Ongoing efforts are necessary to promote equality, justice, and the protection of civil rights for all individuals, irrespective of their race or ethnicity.


Addressing these systemic failures requires comprehensive efforts to reform policies, practices, and cultural norms within organizations, institutions, and society as a whole. It

involved in advancing civil rights and opportunities, challenging discriminatory practices, promoting diversity and inclusion, implementing implicit bias training, fostering community engagement, and supporting initiatives aimed at dismantling systemic racism. The goal is to ensure that African Americans are treated with dignity, fairness, and equality, and that their rights and well-being are fully protected and respected. This work often involves collaboration among activists, community leaders, policymakers, and affected individuals to advocate for systemic changes and promote social justice.

102. On October 1, 2021, and October 5, 2021, Defendant CASTELLUCIO, MALDONADO, CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #1-10 and #21-30 violated existing policies when they encountered Plaintiff MOORE. These violations were a direct result of the collective group bases Defendants' and the CITY's deliberate indifference to Black Freeman/ African Americans.

103. Prior to and at the time of the encounter, Plaintiff MOORE was identified by Defendants CASTELLUCIO, MALDONADO, CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #1-10 and #21-30. As such, Defendants CASTELLUCIO, MALDONADO, CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #1-10 and #21-30 were required to follow certain rules and regulations of the NYPD, some of which, on information, are outlined in the NYPD's departmental policies and which required Defendants to employ particular methods and to otherwise use reasonable care in their treatment of Plaintiff MOORE.

104. Despite the foregoing, Defendants CASTELLUCIO, MALDONADO, CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #1-10 and #21-30 failed to follow departmental policies and other generally accepted standards. Instead, they forced a physical confrontation, used excessive force, and were otherwise wantonly reckless in the manner in which they treated

19

MOORE, in complete disregard for his wellbeing and safety and, in so doing, caused serious and severe injuries to Plaintiff MOORE.

105. Defendants CASTELLUCIO, MALDONADO, CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #1-10 and #21-30 knew of Plaintiff MOORE'S and failed to follow NYPDs protocol on Racial profiling .

106. Despite this knowledge of Plaintiff MOORE, Defendants CASTELLUCIO, MALDONADO, CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #1-10 and #21-30 deliberately and intentionally disregarded the directives for dealing with Black Freeman/African Americans set out in NYPD's policies.

107. As a direct and proximate result of their deliberate disregard of NYPD policies and procedures, Plaintiff MOORE sustained severe and serious injuries.

108. Upon information and belief, CITY and/or NYPD was or should have been aware of police officers' past poor treatment of Racial profiling, yet failed to adequately screen, train, supervise, or discipline police officers regarding Racial profiling Black Freeman/African Americans of citizens including, but not limited to, the use of equipment to restrain persons, evaluation of initial encounters with police controlling situations with Racial profiling and adequate medical care. Said inaction constitutes deliberate indifference that caused the assault and severe and serious injury to Plaintiff MOORE.

109. On October 1, 2021, a collective group named Defendants violated existing policies

which Defendants' and NYCHH's deliberate indifference to individuals deemed as Black Freeman/African Americans

20

110. Prior to and at the time of the encounter, Plaintiff MOORE was identified by Defendants CASTELLUCIO, MALDONADO, CASTRO, PATRICIO, DOES #1-10, VASQUEZ and DOES #1-10 and #21-30.. As such, Defendants NURUR RAHAM, KALU AGWU, RYAN H. HASHE, and GAUTAM BALASUBRAMANIA were required to follow certain rules and regulations of NYCHH, some of which, on information, are outlined in the NYCHH's departmental policies and which required Defendants to employ particular methods and to otherwise use reasonable care in their treatment of Plaintiff MOORE. Defendants NURUR RAHAM, KALU AGWU, RYAN H. HASHE, and GAUTAM BALASUBRAMANIA deviated from appropriate and accepted standards of care for medical professionals.

111. Despite the foregoing, Defendants NURUR RAHAM, KALU AGWU, RYAN H. HASHE, and GAUTAM BALASUBRAMANIA failed to follow departmental policies and deviated from appropriate and accepted standards of care for medical professionals.

112. Instead, collective. Defendants forced a physical confrontation, used excessive force, and were otherwise wantonly reckless in the manner in which they treated Plaintiff MOORE, in complete disregard for his wellbeing and safety and, in so doing, caused serious and severe injuries to Plaintiff MOORE.

113. Defendants NURUR RAHAM, KALU AGWU, RYAN H. HASHE, and GAUTAM BALASUBRAMANIA, DOES #31-40 and DOES #41-50 knew of Plaintiff MOORE'S past history with NYPD and failed to follow NYCHH protocol and deviated from appropriate and accepted standards of care for medical professionals.

114. Despite this knowledge of Plaintiff MOORE'S, Defendants NURUR RAHAM, KALU AGWU, RYAN H. HASHE, and GAUTAM BALASUBRAMANIA, DOES #31-40 and DOES #41-50 deliberately and intentionally disregarded the directives for dealing with

21

Black Freeman/African Americans set out in NYCHH's policies and deviated from appropriate and accepted standards of care for medical professionals.

115. As a direct and proximate result of their deliberate disregard of NYCHH policies and procedures, and deviation from appropriate and accepted standards of care for medical professionals, Plaintiff MOORE sustained severe and serious injuries.

116. Upon information and belief, NYCHH and/or HARLEM was or should have been aware of the collectivel Defendants' past poor treatment of a Black Freeman/African American.

, yet failed to adequately screen, train, supervise, or discipline their employees regarding the health of citizens including, but not limited to, the use of equipment to restrain persons, evaluation of initial encounters with controlling situations with Black Freeman/African Americans

, and adequate medical care. Said inaction constitutes deliberate indifference that caused the assault and severe and serious injury to Plaintiff MOORE.

**  A Custom, Policy, and Practice of Failing to Properly Handle African Americans**

A custom, policy, and practice of failing to properly handle individuals who are African American refers to a systemic issue where there is a consistent failure within organizations, institutions, or government agencies to adequately address the needs, rights, and experiences of African Americans. This failure may manifest in various forms of discrimination, inequality, bias, or mistreatment based on race. Custom refers to an established pattern of behavior or practice that is consistently followed within an organization or system. Policy refers to the written guidelines, rules, or protocols that dictate how an organization should handle specific situations or populations. Practice refers to the actual implementation of those policies or the way things are done in practice. When these three components—custom, policy, and practice—combine to perpetuate a failure to properly handle individuals who are African American, it can result in significant disparities, injustices, and violations of their rights. Some examples of such failures include:Racial profiling: The use of biased or discriminatory practices by law enforcement that disproportionately target African Americans for surveillance, searches, or stops based solely on their race, without reasonable suspicion of criminal activity. Disproportionate use of force: The excessive or unwarranted use of force by law enforcement officers against African American individuals, leading to injury or death, often in situations where non-African American individuals might have been handled differently. Discriminatory practices in employment and housing: Custom, policy, and practice that perpetuate systemic barriers and inequalities in access to employment

Disparities in the criminal justice system: Policies and practices that result in disproportionately higher arrest rates, harsher sentencing, and higher rates of incarceration for African Americans compared to other racial groups, contributing to racial disparities within the criminal justice system.

**COUNT I**
**42 U.S.C. § 1983// 42 U.S.C. § 1985 - Violations of Fourth and Fourteenth Amendment Rights (against Defendants CASTELLUCCIO, BAJNAUTH, MALDONADO, CASTRO, PATRICIO, DOES #1-10, ROSAS #2679, VASQUEZ, DOES #21-30, DOES #31-40, RAHAM, AGWU, HASHE, BALASUBRAMANIA, DOES ALL PARTIES INVOLVED IN SUITE #41-50)**

117. Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

118. In committing the acts and omissions complained of herein, individual Defendants acted under color of state law to deprive Plaintiff MOORE of certain constitutionally protected rights under the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to:

    a. the right to be free from unreasonable search and seizure;

    b. the right to be free from excessive force;

    c. the right to be free from deprivation of life and liberty without due process of law; and

    d. the right to freely associate with one's family and loved ones.

119. Individual Defendants personally violated these constitutional rights or failed to intervene to prevent the violations of these rights even though they had the ability and

120. The unlawful conduct of individual Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed. 121. As a proximate result of individual Defendants' intentional and malicious actions, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal expenses and other special damages, and has suffered great pain and mental anguish, all to Plaintiff's damage in a sum to be provided at trial but not less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages, costs, and attorney's fees pursuant to Title 42 § 1988.

**COUNT II**
**42 U.S.C. § 1983// 42 U.S.C. § 1985 - Violations of Fourth and Fourteenth Amendment Rights (against Defendants CITY OF NEW YORK, NEW YORK CITY HEALTH + HOSPITALS, and HARLEM HOSPITAL MOSTLY ALL PARTIES IN LAWSUITE)**

122. Plaintiff repeats, reiterates, and realizes each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

123. The unconstitutional conduct of individual Defendants was directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by Defendants CITY, NYPD, FDNY, NYCHH, and HARLEM (hereinafter, collectively referred to as "Municipal Defendants") whereby written policies are ignored in practice in favor of *de facto* policies.

124. Municipal Defendants developed and maintained customs, policies, and practices exhibiting deliberate indifference to the constitutional rights of their citizens, which caused the violations of Plaintiff MOORE'S rights.

125. Municipal Defendants have developed and maintained a culture of indifference with

126. Municipal Defendants failed to properly train their employees in their treatment and interaction with Black Freemen(Native Black Americans and/or African Americans. 127. It is also a custom, policy, and/or practice of Municipal Defendants to conduct inadequate screening in the hiring of employees for their propensity for violence and bias against, and insensitivity toward, Black Freemen(Native Black Americans and/or African Americans issues.

128. Municipal Defendants developed and maintained a culture of indifference with respect to Black Freemen(Native Black Americans and/or African Americans, and have created a *de facto* policy of brute and excessive force which, in many instances, have led to severe and serious physical injuries and sometimes death.

129. The *de facto* policy and the culture of indifference have existed for years. 130. As a direct and proximate result of the foregoing acts, omissions, systemic deficiencies, and Municipal Defendants' deliberate indifference, Plaintiff MOORE'S constitutional rights were violated, because of which he suffered substantial damages at an amount to be determined at trial.

131. As a proximate result of Defendants' intentional and malicious actions, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal

expenses and other special damages, and has suffered great pain and mental anguish, all to Plaintiff's damage in a sum to be provided at trial but not less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages, costs, and attorney's fees pursuant to Title 42 § 1988.

**COUNT III**
**The Civil Rights Act of 1866**
**(against All Defendants)**
**(against Defendant s NYPD, CITY OF NEW YORK, NEW YORK CITY HEALTH +**
**HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES AND**

Morningside Heights Housing Corporations Falsely contacted the police and made up a false story .NYPD went with the lie and falsely arrested me on October 1, 2021 because they were targeting me because I'm a Black Freemen(Native Black American) or African American. Also I was trying to file a complaint with the building complex and they retaliated back at me by falsely calling the police. The police tightened the handcuffs on me and left scar marks. All the public resources and private resources subjugated me and marginalized me. I've been dealing with the NYPD doing this for years since October 6, 2015, July 2018, February 11, 2020 and now October 1-5 2021. Its systematic racism from sub ethnic European groups classified as white. Percinit 26 has a past of racially targeting black people in the community with the Cannibal Cop. I quote CBS NEWS "Gilberto Valle was convicted in 2013 of kidnapping conspiracy, but the judge threw out the verdict. He was instead sentenced to time served on a lower-level charge of using a restricted law enforcement database to secretly look up personal information about women he knew. He was also fired from the NYPD."

I like to point out that the medical industrial complex has replicated Prison leasing from the time of reconstructions in America. Where they would exploit black Freemen for free labor after incarcerating them because of Jim Crow policies or The Black code policies. Medical industrial complex in America but specially in New York City was exploiting Black Freeman/African Americans for free medical insurance. It was a social experiment for people at Morningside Gardens. The Community Morningside Gardens, Grand Housing and Columbia University was pro emasculation of Black Freeman/African Americans in the community. I worked at Columbia University as a temp and two Latino women at their office by the 1 train line. where starting to refer to me as a woman or trans referring to the false imprisonment towards me from percinit 26

26) that was influencing private civilians who are Latinos to target Black Freeman/African Americans in the community - to commit hate crimes locally throughout the community. They were also cutting back door deals with single mothers and Older African Americans to have their children falsely imprisoned throughout the community. Doing the same thing that the Nazis were doing to the Jews with Chaim Rumkowski. Also there are professors and college alumni who live in the building complex like my mother. America has historically always used Black Freewomen/African Americans and families that are pro social status quo, but not pro equal justice to participate in the subjugations and marginalizations of their children for profit. The Nazi talked about how Black Freeman /African Americans would behave in this manner because of generational slavery. My father is also involved but did the switch up later on - I was being made the problem child. Also my neighbors, just like the peace officers, were encouraging my mother to be like this. Everyone knew I had my civil rights and constitutional rights violated for years - never helped get an attorney. Also Mount Sinai St Luke's Hospital was covering for the NYPD - when I told them my story.

I am bringing up Prisons leasing during the time of reconstruction which was unconstitutional during the time of Semi-Slavery- Jim Crow. Jim Crow/black codes were unconstitutional and it was re-enslavement for Black Freeman/African Americans for over Hundred years. My Grandparents and Mother and Father were born and raised in semi slavery in America - I was raised by Semi slaves - Semi slavery ended 58 years ago. Semi slavery is when the United States Government chooses not to enforce the constitution for Black Freeman/African Americans. Where Public resources/State resources choose not to enforce the constitutions or Laws for Black Freeman which was re enslavement - semi-Slavery. State resources/ Public resources targeting and influencing private resources and private citizens to attack and target Black

Freedmen Historically LLCs RWL as a form of subjugations and marginalization that they used against Black freemsn. States used Black Codes/Jim Crow, Racial Laws that were racially targeting Black Freeman and shared monopolies with dysfunctional Families - that just got out of Antebellum Slavery. They were exploiting psychological slavery. Including Making up crimes to incarcerate Black Freemen who were pro constitutional - Families where compliances to. The DSM-5, the book that has all mental illnesses known to man, doesn't have anything on psychological slavery and Semi Slavery ended 58 years ago. The Prison industrial complex during that time exploited or recolonized Black Freeman for free labor - Putting Black Freeman back into Antebellum slavery.

Now I would like to bring up current events in today's economy, and talk about the medical industrial complex; practicing and implementing the same form of subjugations and marginalizations of Black Freeman Once again. A renovation of Prison leasing but with the Medical industrial complex. Exploiting Black Freeman for free medical insurance and misdiagnosing them as mentally ill- also using brain altering drugs. This happened multiple times to me on October 6, 2015, July 2018, February 11, 2020 and now October 1 -5 2021.

My Mother Karen Eubanks works for the state as a school teacher, she is a state worker. America has always used Black women as a tool to subjugate and marginalized Black Freeman. The Driver Mama's were the top slaves on plantations If you read and study slave records. They Made women on the plantations historically alfa and made men beta. Slavery in America was a war against Black Freeman because they never wanted Black Freeman/African American men to be men. Medical industrial complex in today's economy has replicated the Prison industrial complex during the time of reconstructions in America - Semi slavery. You have shared monopolies

between 1122 - and 1957 uGSoRWL families documents and resources shared mostly with dysfunctional families(private citizens) for exploiting their children, young Black Freeman especially since  Black Freemen are at the bottom of the house old  medium income which is the representation of the social status quo - racking system in America, pecking order.   Black Freemen  have historically been the number 1 group targeted by the state.   State resources committing white collar crime towards Black Freemen/African Americans for amusement and profit - bad side of capitalism. This is what you call systematic white supremacy, state workers and private citizens who are  pro social status quo but not pro equal justice aggregating together as a collective to subjugate and marginalize Black Freemen/African Americans  mostly and people of other ideologies and social status.  Meaning they mostly target Black Freemen but they do this to other groups too.  large in the number like  Black Freemen/African Americnas not Black Immigrants, they discharge black immigrants in the admissions room. If you were a Black Freemen/African American  they would admit you. Most of the Hospital staff were of immigrant backgrounds. It is a shared monopoly between Systematic white supremacy(White Collar Crime) and Sexism from the women, ageism from the older Black Freemen/African Americans males. The Alpha female is the retaliator, by falsely calling the NYPD(law enforcement) and Beta males' role is to misdirect the youth from taking legal action - Modern day form of child abuse.  Just like Prison Leasing that's why all the families affected by Prison Leasing don't like talking about their families - especially the Black Freemen/African Americans  who were survivors.


To give an ideal of the  social economic environment and a comparison to antebellum slavery .  The Format to my community Amsterdam avenue, Broadway, Harlem and Columbia. Morningside Garden(Morningside Heights Housing Corporations) is The Big House(Slave Owners House) and Grant Housing is  the Slave quarters(where most of the Slaves lived, including the Slave owners home), NYPD(Overseers) percinit 26 is the  headquarters for  the

over law - Most are not elite in white Europe, in fact you are then ruled by the emperor - not law but of the punishment - the muscle. The  Mothers(Alpha Females) in the community  are Driver MaMas. If you didn't know the plantations were matriarchal in America because that was part of sexual exploitation, they never wanted men to be men- so they gave women more privilege on the plantations. Most men on the plantations were beta males through social engineering.  Making men think with the left side of their brain and making women think with the right side of their brain. State Hospitals have been used as punishment facilities against  Black Freeman/African American young men  and women - other Racial Ethnics groups go through this, but not as large in the number  as Black Freemen/African Americans. It is the mothers(Driver MaMas) mostly implementing   this form of subjugation and marginalization - punishment. This form of subjugations and marginalizations is a way to refert man to a childish state under the disguise of mental illness or imposed  homosexuality.


I like to talk about Columbia University and its  historical past of being founded  by Slave owners. Including from a social economic political standpoint in the present time. If you didn't know, Columbia University owns the majority of the real estate in Harlem and in Upper manhattan - monopoly. If you own and control the majority of your social economic environment, you have a certain level of power over it -  you dictate what the norms are.  You can play god to a certain level and dictate who will be rewarded for their actions by elevating their financial status. You can punish people locally throughout the community by not offering employment and the businesses that are in a shared monopoly have to take orders from the number 1 entity(monarch);. that owns and controls the majority  of the real estate and resources(wealth) in the community - you can be Black listed. You can create a social environment with certain character traits like Slave traits renovated from Antebellum slavery or like Driver Mamas(women) and Overseers(NYPD). Legal terms for buying state resources like law enforcement to do your

(State resource) was in a municipal monopoly(shared monopoly/partnership) with Columbia University during the time of  Kam Brock - 2014 . The woman was falsely admitted into Harlem hospital because law enforcement couldn't  believe she owned a BMW and  she was  sexually assaulted  in  the  hospital.  Morningside Gardens(Morningside Heights Housing Corporations) is right underneath Columbia University and  a lot of Alumni Live in Morningside gardens like my mother including Professors. There is an old female Anglo Saxon college Professor  who I always saw as a kid growing up in  building 70 in the  complex - she is very friendly to Mr Montovo(Top Peace officer)  even after he parently harassed a female Peace officer. She's been teaching there since Obama was a student there. My Mother got in through legacy because of my grandfather, she is also a former alumni of Sara Loriance .


Reason why bring this up is because i like to reference the preface of miseducations of negro by Carter  G.  woodsen.  In  His  Book,  he  said  educated  Black  Freemen/African  Americans  who attended college universities  perpetuate the regime of the oppressor.  He was talking about social engineering and how social conditioning is socialization which is social indoctrination based off of  social  engineering ,  who  owns  and  controls  the  resource  is  in  charge  of  the  process.  In  the original book cover of the Mis educations of the negro, there is a Black Freewomen/African American with a chain and lock rapped around her head. The author was sending a message to readers  through  images  about  the  system  of  white  supremacy  during  Semi  slavery.   He  was referring to the  Driver Mama  system from antebellum slavery was still in effect in the  Black social economic environment, it explains prison leasing better during the time of reconstruction. Especially when you find out what the Slave Driver Mamas were very good for implementing punishment - such as social Isolation. Think about that after someone who has been deemed as mentally unfit- it's easy to socially excommunicate them with the help of the grape vine.  Black

Case 1:23-cv-10957-LGS-RWL    Document 86    Filed 09/05/23    Page 44 of 72

Most are an ethnic minority and cannot be ethnic groups somehow specified as a manufacturer  cultural group such as their sex(women); aggregating together to implement racism through slander - feminist. Sex is treated like a racial ethnic group in America. I like to bring up destruction of Black civilizations by Chancellor Williams and compare the review of the book with the preface of the mis educations of the negro by Carter G. woodson. Where in Destruction Black civilization talks about a British man named Licon attending Oxford University. He came from a lower middle class background  and attended Oxford University where he became  socialized by his environment,  where  he know longer went back home to his town. He had more in common with fellow college students. They say 80% of educations is based on socializations and 20% is based on

Historical references

**Ivan VI of Russia (1740-1764):**

Ivan VI, born on August 23, 1740, in St. Petersburg, Russia, was the great-nephew of Empress Anna of Russia. At the tender age of two months, following Empress Anna's demise in 1740, Ivan VI was declared the tsar. Given his infancy, a regency was instituted, with his mother, Empress Anna Leopoldovna, assuming the role of regent. However, the Russian court soon became a battleground for power struggles and internal conflicts, plunging the realm into turmoil.

Merely a year into Ivan VI's reign, Empress Elizabeth seized the throne in 1741. This marked the end of Ivan VI's rule, as Empress Anna Leopoldovna was deposed, and he was subjected to severe confinement at various locations.

Case 1:21-cv-10807-LGS-RWL Document 86 Filed 09/05/23 Page 45 of 72

Ivan VI's lineage, LGS, was snared in political machinations aimed to exploit him as a potential contender for the throne. In 1762, during Catherine the Great's ascent to power in a coup, Ivan VI's fate took a tragic turn. Fearing that his supporters might orchestrate his release and challenge her rule, Catherine ordered Ivan VI to be transferred to the remote Shlisselburg fortress.

In 1764, at the youthful age of 23, Ivan VI met his demise during a thwarted rescue mission. Unaware of Ivan's true identity, a group of army officers attempted to liberate him from Shlisselburg fortress. However, in the chaos of the rescue, Ivan was tragically killed by his own guards. His death marked the conclusion of the direct Romanov lineage that had governed Russia. Subsequent generations of the Romanov family would continue to exert a profound influence on global history. Ivan VI's poignant tale serves as a poignant illustration of the intrigue and power struggles that typified 18th-century Russian history. Despite his brief reign and subsequent obscurity, his story underscores the profound impact of the circumstances that prevented him from exercising effective rule.

**Mustafa:**

Mustafa's narrative unfolds against a backdrop of profound adversity. Notably, his life was marked by the intricate complexities of his existence and the poignant specter of child abuse. This ordeal stemmed from his brother's magnanimous decision to spare him following the Ottoman Empire's acquisition. The tragic chapter in Mustafa's life was initiated by maternal transgressions that subjected him to harsh confinement within the confines of his chamber.

This confinement, which encompassed both physical and psychological dimensions, precipitated a regression in Mustafa's development. It cast him into a state resembling childhood, a transformation that endured even as he transitioned into adulthood. The intricate interplay of

familial dynamics, his father's recusion, and his meticulous interventions stand as a somber testament to the layered adversities that marred Mustafa's life journey.

Plaintiff's damage in a sum to be provided at trial but not less than NINE  MILLION DOLLARS ($9,000,000.00), plus punitive damages, costs, and attorney's fees pursuant to Title 42 § 1988.

**COUNT IV**
**42 U.S.C. §1983// 42 U.S.C. § 1985  - Failure to Intervene**
**(against Defendants CASTELLUCCION, MALDONADO, NEW YORK CITY POLICE OFFICER DAVID CASTRO, NEW YORK CITY POLICE OFFICER NILSA PATRICIO, NEW YORK CITY POLICE OFFICER JOHN DOES #1-10, NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679, NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, NEW YORK CITY FIRE DEPARTMENT EMS/EMT JOHN DOES #21-30, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40, DOCTOR NURUR RAHAM, DOCTOR KALU AGWU, DOCTOR RYAN H. HASHE, DOCTOR GAUTAM BALASUBRAMANIA, and HARLEM HOSPITAL JOHN DOES ALL PARTIES IN ALL LAWSUITE #41-50)**

142.  Plaintiff repeats, realleges, and reiterates each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

143. Individual Defendants had an affirmative duty to intervene on Plaintiff MOORE'S

behalf to prevent violation of his constitutional rights despite having had a realistic opportunity to

do so.

144. The individual Defendants failed to intervene on Plaintiff MOORE'S behalf to

prevent violation of his constitutional rights despite having substantially contributed to the

circumstances within which Plaintiff MOORE'S rights were violated by their affirmative

conduct.

145. As a result of such failure to intervene, Plaintiff MOORE'S constitutional rights

were violated.

146. As a proximate result of individual Defendants' intentional and malicious actions,

Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees,

associated legal expenses and other special damages, and has suffered great pain and mental

anguish, all to Plaintiff's damage in a sum to be provided at trial but not less than NINE

MILLION


DOLLARS ($9,000,000.00), plus punitive damages, costs, and attorney's fees pursuant to Title

42  § 1988.

### COUNT V
### Municipal Liability 42 U.S.C. § 1983// 42 U.S.C. § 1985
### (against Defendants CITY OF NEW YORK, NEW YORK CITY HEALTH +
### HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES  ALL
### PARTIES IN LAWSUIT)

147. Plaintiff repeats, reiterates, and realleges each and every allegation contained in  those

paragraphs of the Complaint marked and numbered previously and/or herein with the same  force

and effect as if more fully set forth at length below.

148. That Municipal Defendants are "persons" within the meaning of 42 U.S.C. § 1983.   149.

That Defendant CITY, by failing to properly hire, screen, train, discipline, or supervise

agencies, had in effect *de facto* policies, practices, customs, and usages that were

a direct and proximate cause of the unconstitutional conduct of Defendant DOES.   150. That it is

common practice and common knowledge that police officers of  Defendant CITY routinely

arrest individuals, fail to properly deescalate the encounter, use  excessive force, and otherwise

fail to follow departmental policies and/or other generally accepted  standards when dealing with

Black Freemen(Native Black Americans and/or African Americans.

151. That it is common practice and common knowledge that police officers of

Defendant CITY force physical confrontation, used excessive force, and are otherwise wantonly

reckless in the manner in which they treat Black Freemen(Native Black Americans and/or

African Americans, in complete disregard for  their wellbeing and safety and, in so doing, cause

serious and severe injuries to said individuals.

152. That Defendant CITY has failed to either discipline and/or properly train its officers

on how to respond to and/or interact with Black Freemen(Native Black Americans and/or African

Americanss.

153. Defendant CITY has failed to respond to the continuing and urgent need to prevent,

restrain, and discipline police officers who wrongfully violate Constitutional rights of citizens,

use  excessive force, Black Freemen(Native Black Americans and/or African Americans, and

Defendant CITY has failed to find that civilian complaints made against police officers are

founded  or valid in anyway; therefore, Defendant CITY is liable under 42 U.S.C. § 1983 because

Defendant CITY has had actual and/or constructive knowledge of the patterns of abuse and

excessive force  against Black Freemen (Native Black Americans) and/or African Americans by

its police officers, employees, and/or agents in  violation of the United States Constitution and,

because of Defendant CITY and NYPD'S un-meaningful policy and custom for reviewing

conduct and knowingly failed to correct the Defendants or their policy and their patterns of abuse, excessive force, unlawful search and seizure of personal property, and discriminatory legal enforcement, all in violation of Plaintiff's rights.

154. Upon information and belief, specific systemic flaws in Defendant CITY'S civilian complaint review process include, but are not limited to, the following:

a. Preparing reports regarding investigations of beatings incidents as routine point by-point justifications of police officer actions, regardless of whether such actions are justified;

b. Police officers unlawfully prosecuting persons of Black Freemen/Native Black Americans and/or African Americans, and violating rights granted to them by the United States Constitution;

c. Police officers investigating civilian police encounters systemically fail to credit testimony by non-police officer witnesses, and uncritically rely on reports by police officers involved in the incident;

d. Police officers investigating excessive force, fail to include in their reports relevant factual information which would tend to contradict the statements of the police officers involved;

e. Supervisory police officers at times issue public statements exonerating police officers for excessive use of force, unlawful searches and seizures of personal property, and use of unnecessary and excessive force before the investigation of the incident by the police department has been completed; and

f. Reports in EDP cases are not reviewed for accuracy by supervisory officers. Conclusions are frequently permitted to be drawn on the basis of clearly incorrect or

155. The foregoing acts, omissions, systemic flaws, policies, and customs of Defendants CITY and NYPD caused individual Defendants to believe that brutality and other improper actions would not be aggressively, honestly, and properly investigated, with the foreseeable result that officers are most likely to use excessive force in situations where such force is neither necessary nor reasonable.

156. Defendants CITY and NYPD were reckless, careless, intentional, negligent, and/or deliberately indifferent in the training, hiring, administration, and supervision of the police officers, including individual Defendants, with respect to the use of force against Black Freemen(Native Black Americans and/or African Americans, the arrest of such persons, and the recognition and preservation of the civil and constitutional rights of such persons.

157. As a proximate result of Defendants' intentional and malicious actions, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal

expenses and other special damages, and has suffered great pain and mental anguish, all to Plaintiff's damage in a sum to be provided at trial but not less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages, costs, and attorney's fees pursuant to Title 42 § 1988.

## COUNT VI
### Violations of New York State Constitution
**(against Defendants CASTELLUCCION, MALDONADO, NEW YORK CITY POLICE OFFICER DAVID CASTRO, NEW YORK CITY POLICE OFFICER NILSA PATRICIO, NEW YORK CITY POLICE OFFICER JOHN DOES #1-10, NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679, NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, NEW YORK CITY FIRE DEPARTMENT EMS/EMT JOHN DOES #21-30, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40, DOCTOR NURUR RAHAM, DOCTOR KALU AGWU, DOCTOR RYAN H. HASHE,**

158. Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

159. Individual Defendants subjected Plaintiff to the foregoing acts and omissions without due process of law, thereby depriving Plaintiff of rights, privileges, and immunities guaranteed by Article 1, §§ 6 and 12 of the New York State Constitution, including, without limitation, the right to due process and the right to be free from unreasonable searches and seizures.

160. As a proximate result of Defendants' intentional and malicious actions, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal expenses and other special damages, and has suffered great mental anguish, all to Plaintiff's damage in an amount to be provided at trial but no less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages and attorney's fees.


**<u>COUNT VII</u>**
**<u>Assault and Battery</u>**
**(against Defendants CASTELLUCCION, MALDONADO, NEW YORK CITY POLICE OFFICER DAVID CASTRO, NEW YORK CITY POLICE OFFICER NILSA PATRICIO, NEW YORK CITY POLICE OFFICER JOHN DOES #1-10, NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679, NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, NEW YORK CITY FIRE DEPARTMENT EMS/EMT JOHN DOES #21-30, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40, DOCTOR NURUR RAHAM, DOCTOR KALU AGWU, DOCTOR RYAN H. HASHE, DOCTOR GAUTAM BALASUBRAMANIA, and HARLEM HOSPITAL JOHN DOES ALL THE PARTIES IN THE LAWSUIT #41-50)**

161. Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same

162. Individual Defendants, without just cause, willfully and maliciously used physical force against Plaintiff MOORE, causing him to sustain severe and serious injuries. 163. Individual Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Plaintiff MOORE'S rights and are therefore liable for punitive damages.

164. As a proximate result of Defendants' intentional and malicious actions, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal expenses and other special damages, and has suffered great mental anguish, all to Plaintiff's damage in an amount to be provided at trial but no less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages and attorney's fees.

## COUNT VIII
### Intentional Infliction of Emotional Distress
**(against Defendants CASTELLUCCION, MALDONADO, NEW YORK CITY POLICE OFFICER DAVID CASTRO, NEW YORK CITY POLICE OFFICER NILSA PATRICIO, NEW YORK CITY POLICE OFFICER JOHN DOES #1-10, NEW YORK CITY FIRE DEPARTMENT EMT/EMS ROSAS #2679, NEW YORK CITY FIRE DEPARTMENT EMT/EMS VASQUEZ, NEW YORK CITY FIRE DEPARTMENT EMS/EMT JOHN DOES #21-30, NEW YORK CITY HEALTH + HOSPITALS JOHN DOES #31-40, DOCTOR NURUR RAHAM, DOCTOR KALU AGWU, DOCTOR RYAN H. HASHE, DOCTOR GAUTAM BALASUBRAMANIA, and HARLEM HOSPITAL JOHN DOES ALL THE PARTIES INCLUDE IN THE LAWSUITE #41-50)**

165. Plaintiff repeats, reiterates, and realizes each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

166. Individual Defendants, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally and/or recklessly caused Plaintiff to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

167. All of these acts were performed without any negligence on the part of Plaintiff and were the proximate cause of injuries to Plaintiff.

168. Defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for Plaintiffs' rights and are therefore liable for punitive damages. 169. As a proximate result of Defendants' intentional and malicious actions, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal expenses and other special damages, and has suffered great mental anguish, all to Plaintiff's damage in an amount to be provided at trial but no less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages and attorney's fees.

## COUNT IX
### *Respondeat Superior*
**(against Defendants CITY OF NEW YORK, NEW YORK CITY HEALTH + HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES AND OTHER PARTIES)**

170. Plaintiff repeats, reiterates, and realizes each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

171. At all relevant times, individual Defendants were employees of Municipal Defendants and were acting within the scope of their employment.

172. Municipal Defendants are, therefore, vicariously liable under the doctrine of *respondeat superior* for the actions of individual Defendants set forth herein. 173. As a proximate result of Defendants' intentional and malicious actions, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal expenses and other special damages, and has suffered great mental anguish, all to Plaintiff's damage in an amount to be provided at trial but no less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages and attorney's fees.

## COUNT X
### Negligent Hiring

**(against Defendants CITY OF NEW YORK, NEW YORK CITY HEALTH + HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES AND OTHER PARTIES INCLUDED IN LAW SUITE)**

174. Plaintiff repeats, reiterates, and realizes each and every allegation contained in those paragraphs of the Complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

175. Upon information and belief, it was the custom, policy, and practice of Municipal Defendants to hire certain employees, including individual Defendants, without conducting the appropriate background checks, investigations, and psychological evaluations.

176. Upon information and belief, it was the custom, policy, and practice of Municipal Defendants to conduct inadequate investigations of candidates as was done with individual Defendants.

177. Upon information and belief, it was the custom, policy, and practice of Municipal Defendants to inadequately supervise the actions and conduct of employees, including individual Defendant.

178. Upon information and belief, it was the custom, policy, and practice of Municipal Defendants to continue to employ individuals, including individual Defendants, after it is known that such individuals consistently violate the constitutional rights of persons such as Plaintiff MOORE.

179. These customs, policies, and practices were the moving force, proximate cause, or affirmative link behind the conduct causing Plaintiff MOORE'S injuries.

180. Municipal Defendants are, therefore, liable for violations of Plaintiff MOORE'S constitutional rights as caused by Defendants as described in more detail in the foregoing paragraphs; and Plaintiff has suffered damages therefrom.

181. As a proximate result of Municipal Defendants' customs, policies, and practices for negligent hiring, improper supervision, and improper retention of employees, Plaintiff was greatly humiliated, injured in his reputation, caused to incur attorneys' fees, associated legal expenses and other special damages, and has suffered great mental anguish, all to Plaintiff's damage in a sum to be provided at trial but not less than NINE MILLION DOLLARS ($9,000,000.00), plus punitive damages and attorney's fees.

### **Conspiracy to Deprive Rights/ 42 U.S.C. § 1985**
### **(against Defendant sNYPD, CITY OF NEW YORK, NEW YORK CITY HEALTH + HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES AND MORNINGSIDE HEIGHTS HOUSING CORPORATION OTHER PARTIES)**

This situation pertains to a consortium involving the Morningside Heights Housing Corporation, the New York Police Department (NYPD), Harlem Hospital, and Mount Sinai St. Luke's, which includes private individuals, including families, and seeks to establish a shared monopoly over public resources. The primary objective appears to be the exploitation of individuals for insurance purposes while concurrently orchestrating attacks on specific racial or social groups, effectively diverting attention from their actions.

Within this framework, public institutions such as Harlem Hospital seemingly serve as instruments of punitive action against families deemed non-conducive to the prevailing social norms, rather than advocates of equal justice. These families are often subjected to misdiagnosis

employed to suppress individuals with dissenting political views, utilizing brain-altering medications as a means of control.

A critical incident occurred on October 1, 2021, wherein my Fourth and Fourteenth Amendment rights were egregiously violated by the NYPD. This violation transpired under the pretext of false allegations put forth by the Morningside Heights Housing Corporation. Notably, an individual named James, who previously held a position within the Corporation, remained conspicuously silent during this ordeal, likely possessing prior knowledge of my imminent transfer to Harlem Hospital, where the situation escalated further. Disturbingly, I was not afforded the choice of my medical facility.

Furthermore, on October 5, 2021, my Fourth and Fourteenth Amendment rights were once again transgressed when Karen, possibly acting in concert with other parties, permitted the NYPD access to my apartment. This incident signifies an overarching pattern of constitutional violations perpetrated within the framework of a shared monopoly, including encroachments upon my First Amendment rights within the building complex.

I intend to pursue legal action to address these violations in separate complaints, with a view to seeking redress for the infringements upon my constitutional rights and holding the responsible parties accountable.

42 U.S.C. § 1985, often referred to as "Section 1985," is a federal statute that addresses conspiracies to interfere with civil rights. This statute provides individuals with a legal recourse when they have been harmed by conspiracies aimed at depriving them of their rights, often involving two or more persons acting together. Here's an overview of the key aspects of Section

**Conspiracy to Deprive Rights:** Section 1985 specifically addresses conspiracies that are designed to obstruct or hinder the enjoyment of certain rights, privileges, or immunities secured by the U.S. Constitution. This includes rights guaranteed under the First, Second, Third, and Fourth Amendments, among others.

**Elements of a Claim:** To succeed in a Section 1985 claim, a plaintiff must generally establish the following elements:

- A conspiracy or agreement among two or more individuals.

- The purpose of the conspiracy is to deprive the plaintiff of a federal right or privilege.

- An overt act in furtherance of the conspiracy.

- The plaintiff was injured as a result of the conspiracy.

**Classes of Protected Rights:** Section 1985 contains several subsections, each addressing a different type of protected right. Subsections include:

- Subsection (1): Preventing an officer from performing official duties.

- Subsection (2): Obstructing justice in federal courts.

- Subsection (3): Depriving any person of equal protection of the laws.

- Subsection (4): Preventing an individual from accepting or holding public office.

**State Action:** Like Section 1983, Section 1985 requires the involvement of state action or action under color of state law for a claim to be valid. The conspirators must be acting with the authority or power of the state.

**Private Parties:** Unlike Section 1983, Section 1985 claims can involve private individuals as well as government officials. However, there must still be a state action component.

**Remedies:** If successful, plaintiffs in Section 1985 cases can seek remedies such as injunctive relief, compensatory and punitive damages, and attorney's fees.

immunity and the lack of the required elements of a conspiracy.

Section 1985 was enacted to address situations in which individuals or groups conspire to undermine or deny civil rights protected by the Constitution. If you believe you have been harmed by a conspiracy aimed at depriving you of your rights, it's important to consult with an attorney who specializes in civil rights law and federal litigation. An attorney can evaluate your situation, help you understand the viability of a Section 1985 claim, and guide you through the legal process.

## EXTRA COUNTS
### The Civil Rights Act of 1871
**(against Defendant s NYPD, CITY OF NEW YORK, NEW YORK CITY HEALTH + HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES AND MORNINGSIDE  HEIGHTS HOUSING CORPORATION OTHER PARTIES),**

The Civil Rights Act of 1871, commonly known as the Ku Klux Klan Act, is a federal statute crafted to safeguard the civil liberties of individuals against encroachments by state and local authorities, encompassing law enforcement agencies such as the New York City Police Department (NYPD). Initially enacted to counteract the rampant violence and intimidation perpetrated by the Ku Klux Klan during the tumultuous Reconstruction Era, this legislation has since found application in addressing instances of civil rights transgressions involving the NYPD in a variety of contexts. Herein lie illustrative instances of how the Civil Rights Act of 1871 has been invoked in matters implicating the NYPD:

**Police Brutality and Excessive Use of Force:** This statute has been wielded in cases where NYPD officers stand accused of deploying excessive force or engaging in acts of police brutality against individuals, with a notable emphasis on those hailing from marginalized communities. Plaintiffs have initiated legal actions pursuant to Section 1 of

the various contentions that constitutionally protected rights, specifically the prohibition against unreasonable seizures or unwarranted use of force, were transgressed.

**Racial Profiling and Discriminatory Policing:** Instances wherein the NYPD has been alleged to engage in racial profiling or discriminatory policing practices have prompted the invocation of the Civil Rights Act of 1871. Litigants have instituted legal proceedings under Section 1 (42 U.S.C. § 1983) and Section 2 (42 U.S.C. § 1985), asserting a conspiracy within the NYPD to deprive individuals of their civil rights predicated upon their racial or ethnic backgrounds.

**Violations of First Amendment Rights:** The Act has been invoked in cases where individuals have asserted that the NYPD infringed upon their First Amendment rights, encompassing the freedoms of speech and peaceful assembly. Lawsuits have been initiated under Section 1 (42 U.S.C. § 1983) as a means of seeking redress for alleged encroachments upon these constitutional prerogatives.

**Failure to Prevent Civil Rights Violations:** Section 3 of the Civil Rights Act of 1871 (42 U.S.C. § 1986) has been referenced in instances where the NYPD faced allegations of neglecting its duty to forestall civil rights infractions committed by its officers. Plaintiffs have argued that the NYPD possessed knowledge pertaining to a conspiracy or recurrent pattern of civil rights abuses and failed to take requisite measures to forestall or terminate such transgressions.

**Unlawful Arrests and False Imprisonment:** The Act has been deployed in scenarios where individuals have alleged unlawful arrests or false imprisonment at the hands of NYPD personnel. Legal actions have been initiated under Section 1 (42 U.S.C. § 1983), with claimants contending that their Fourth Amendment rights safeguarding against unreasonable searches and seizures were violated.

It is imperative to acknowledge that the application of the Civil Rights Act of 1871 in cases
involving the NYPD or any law enforcement entity necessitates a meticulous scrutiny of the
specific circumstances and evidentiary facets inherent to each case. Each legal claim is
intrinsically distinct, and the prospects of success therein hinge upon the merits of the allegations
and the evidential substratum available.

The Civil Rights Act of 1871 endures as an indispensable instrument for the preservation of
individual civil rights and the imposition of accountability upon government functionaries,
including law enforcement, in instances where such rights are purportedly infringed upon. It
remains a substantial legal foundation for the pursuit of justice and redress in matters entailing
alleged violations of civil rights by the NYPD and analogous law enforcement agencies.

On the morning of October 1, 2021, MorningSide Heights Housing Corporation purportedly
perpetrated the deplorable act of falsely notifying the New York Police Department (NYPD) with
ostensible designs to orchestrate my unwarranted and unsubstantiated incarceration. This
egregious incident gave rise to a patent transgression of my constitutional rights, particularly
those enshrined within the Fourth and Fourteenth Amendments, which serve as bulwarks against
unjustified searches and seizures while ensuring due process and equal protection under the law.

The unfolding sequence of events raises profound concerns regarding the integrity of the law
enforcement process. Subsequent to my apprehension, I found myself subjected to unjust
handcuffing, exacerbating my distress as the handcuffs were deliberately tightened, needlessly
intensifying my discomfort. This unwarranted physical restraint was imposed without justifiable
cause, flagrantly infringing upon my rights and compounding the violation that had already been

The violation of my liberties extended to my unwarranted transfer to Harlem Hospital against my explicit and unequivocal wishes. This relocation occurred without my informed consent, further eroding my autonomy over my own well-being. Within the confines of Harlem Hospital, my treatment deviated from established hospital policies and protocols, creating an unsettling departure from fundamental expectations of patient care.

Furthermore, the atmosphere within Harlem Hospital became one marked by threat and aggression, perpetuated by individuals designated as hospital police. This unwarranted intimidation escalated into outright assault, thereby compounding the injustices I had already endured. My rights as a patient and as an individual were egregiously violated, underscoring the imperative need for accountability within institutions entrusted with the well-being and safety of individuals seeking medical care.

Throughout this harrowing ordeal, my attempts to navigate the situation and exercise my rights as a patient were met with systemic obstacles. Efforts to seek assistance through provided contact numbers yielded unproductive results, as the lines directed me towards the jurisdiction of hospital police, bypassing the anticipated channels for addressing my concerns.

In light of the sequence of events that transpired on that fateful day, it is evident that a grave miscarriage of justice occurred. My rights, both as a citizen and as an individual seeking medical attention, were callously disregarded and trampled upon. This narrative raises profound questions about the intersection of institutional responsibility, patient autonomy, and the imperative to uphold constitutional safeguards, underscoring the pressing need for comprehensive reform and accountability within the realms of law enforcement and medical care.

On the 2nd of October, 2021, in pursuit of assistance and solace, I hurried to Mount Sinai St.

Case 1:22-cv-10957-LGS-RWL Document 86 Filed 09/05/23 Page 62 of 72

hope was gradually replaced by a disillusioning reality, as it became apparent that the hospital's intentions appeared to align with obscuring the actions of the New York Police Department (NYPD), despite my sound state of being. The conviction that the hospital would offer refuge from the events of the prior day was gradually supplanted by the suspicion that a cover-up might be underway. This suspicion was reinforced by a visual encounter with two police officers who had been present during the events of October 1st, 2021, conspicuously within the precincts of Mount Sinai St. Luke's on October 2nd.

Fast forward to the 5th of October, 2021, a date marked by a coordinated effort among residents and personnel associated with MorningSide Heights Housing Corporation. Their collective actions materialized in a deceptive summoning of the NYPD, a ruse executed with cunning while I had returned home to retrieve my personal belongings. To my astonishment, the NYPD entered my residence without prior consent, egregiously overstepping their bounds and intruding upon my abode without just cause or authorization. My explicit directive for them to vacate my apartment went unheeded, and they persisted in remaining within the premises until I was coerced into accompanying them, an action that exuded an unsettling aura of intimidation. The lack of a cogent rationale for their entry, coupled with their refusal to depart upon my request, underscores a stark violation of my Fourth and Fourteenth Amendment rights, emblematic of their disregard for due process and equal protection.

Compounding this narrative of encroachment and constitutional infringement is the episode that unfolded on the 5th of October, 2021—a forced repetition of events eerily reminiscent of a prior occurrence on the 11th of February, 2020, at the same Mount Sinai St. Luke's Hospital. The parallels between these occurrences are stark: a coerced evaluation against my volition, seemingly at the behest of external actors. The events of February 11, 2020, remain particularly vivid—a scenario wherein I was led to believe that discharge was imminent without any accompanying

The occurrences of the 5th of October, 2021, and the preceding dates—February 11, 2020, and October 2, 2021—attest to an alarming pattern, one fraught with not only an unjust invasion of personal sovereignty but also a departure from medical best practices. The unwarranted imposition of psychiatric evaluations within the confines of the admissions room on these dates speaks to a blatant instance of medical malpractice, undermining the principles of ethical medical care and patient autonomy. In scrutinizing these events collectively, a mosaic of transgressions emerges, underscored by a dire need for transparency, accountability, and the unwavering adherence to both legal and medical principles.

I found myself compelled to undergo a psychiatric evaluation on two distinct occasions, once on February 11, 2020, and again on October 5, 2021. During the latter event, I was subjected to an involuntary psychiatric assessment within the confines of Mount Sinai St. Luke's Hospital. Remarkably, this déjà vu-like scenario had also unfolded on the 11th of February, 2020, within the very same hospital premises.

These instances stand as poignant examples of a disconcerting pattern, whereby my agency and autonomy were wrested from me, compelling me to undergo psychiatric evaluations against my volition. Both occurrences transpired within the environment of Mount Sinai St. Luke's, raising questions about the hospital's protocols, practices, and respect for patients' autonomy in seeking or refusing medical procedures.

In scrutinizing the parallels between these two events, it becomes evident that the hospital's actions carried forth an unsettling sense of repetition and an unwarranted departure from standard medical procedures. This juxtaposition underscores the significance of examining the practices and ethics of medical institutions, particularly when it comes to the imperative of securing

The comparison drawn between the feminist movement and the Ku Klux Klan, particularly in the context of historical discussions involving Black Freemen, introduces a contentious viewpoint. Margaret Sanger, a prominent figure associated with the feminist movement, was also affiliated with the eugenics society and notably engaged in meetings and gatherings with the Ku Klux Klan. Sanger's identity as a feminist and her identification with the LGBT community compounds the intricacy of her associations.

When delving into the historical consequences of the feminist movement on the Black Freemen community, a nuanced perspective emerges—one that leans predominantly towards negative repercussions. Parallel to the activities of the Ku Klux Klan and the eugenics society during a period that coincided with semi-slavery, feminist actions appeared to mirror the hate-driven crimes targeting Black Freemen. These organizations, it is asserted, were interconnected through shared affiliations, yielding a confluence of discriminatory practices.

An intriguing facet in this discourse is the tendency of certain feminists to prioritize their gender identity over their racial or ethnic affiliations. This manifests in the deliberate alignment with their female identity, relegating their racial background to a secondary consideration. A shift in cultural dynamics unfolded during the post-1960s era, when the identity of "women" assumed the role of a crafted cultural group, ushering in the second wave of feminism during the 1970s.

Eng

**<u>EXTRA COUNTS</u>**

<u>The Civil Rights Act of 1964</u>

**(against Defendant s NYPD, CITY OF NEW YORK, NEW YORK CITY HEALTH + HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES AND MORNINGSIDE HEIGHTS HOUSING CORPORATION OTHER PARTIES),**

The Fourth and Fourteenth Amendments have been violated by all parties involved in this situation. Two public hospitals, Harlem Hospital and Mount Sinai St. Luke's, are public facilities that have not only violated these constitutional amendments but have also been complicit in assisting the NYPD in violating my rights and covering up their actions. Additionally, Morningside Heights Housing Corporations retaliated against me when I attempted to file a complaint. They threatened me, implying that more peace officers would come and harm me if I didn't leave. I also heard that Montovo allegedly followed a female peace officer back home, resulting in a lawsuit against the building corporations for $250,000, yet he was allowed to remain. I was attempting to file a complaint against him and Gilumore.

Upon my attempt to register a complaint with the management at Morningside Heights Housing Corporations, a distressing turn of events unfolded as they chose to retaliate against me by making false contact with law enforcement authorities.

Most peace officers lied about their roles, claiming to be security guards within the building complex. My family and I were unaware of the incident involving the female peace officer.

The Civil Rights Act of 1964 is a federal law designed to prohibit discrimination based on various factors such as race, color, religion, sex, or national origin in different aspects of American society, including employment, public accommodations, and federal programs. Although it primarily addresses discrimination in general, it can also be applied to law enforcement agencies like the NYPD if they engage in discriminatory practices or violate individuals' civil rights.

For instance, Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on the aforementioned characteristics. This means that the NYPD, as an employer, cannot discriminate against individuals in hiring, promotions, or any other employment-related decisions based on these protected characteristics.

Title VI of the Act further prohibits discrimination in any program or activity receiving federal financial assistance based on race, color, or national origin. Since the NYPD receives federal funding, it is subject to Title VI. If the NYPD is alleged to engage in discriminatory policing practices, such as racial profiling, it may face legal challenges under Title VI.

Addressing such violations typically involves legal action in federal court, where evidence is gathered to demonstrate that the NYPD engaged in discriminatory practices or violated individuals' civil rights based on the protected characteristics covered by the Act.

**federal Funding and Programs:** The act prohibits discrimination in any program or activity receiving federal financial assistance, thus extending its reach to various federally funded entities, including state and local governments.

**Protections Against Retaliation:** The act includes provisions to protect individuals who

institutions, or others.

The Civil Rights Act of 1964 was a major step forward in the ongoing struggle for civil rights and equality in the United States. It played a pivotal role in dismantling the legal framework of racial segregation and discrimination that had been deeply entrenched in American society for many years. While it addressed several forms of discrimination, it also set the stage for subsequent civil rights legislation that further expanded protections and aimed to ensure equal rights and opportunities for all Americans.

**EXTRA COUNTS**
**the Civil Rights Act of 1968 ,**
**(against Defendant s NYPD, CITY OF NEW YORK, NEW YORK CITY HEALTH +**
**HOSPITALS, and HARLEM HOSPITAL, MOUNT SINAI ST LUKES AND**
**MORNINGSIDE  HEIGHTS HOUSING CORPORATION OTHER PARTIES),**

If a housing complex attempts to obstruct the pursuit of a complaint by falsely involving law enforcement, such a maneuver could potentially be interpreted as an effort to impede the rights safeguarded under the provisions of the Fair Housing Act of 1968. The Fair Housing Act is designed to prevent discriminatory practices in housing, encompassing prohibitions against

retaliatory actions against individuals who exercise their rights under the act, such as filing grievances or asserting their entitlements. This legal framework inherently provides protections against reprisals aimed at those who expose violations of the act.

Instances of retaliation or interference with the rights granted by the Fair Housing Act can take various forms, including actions designed to intimidate, harass, or discourage individuals from conscientiously exercising their rights. The act of making a false report to the police with the intent to hinder your pursuit of a complaint could be seen as a maneuver aimed at obstructing your rights, potentially constituting a violation of the Fair Housing Act.

The New York Police Department (NYPD) engaged in a practice of racial profiling against me, resulting in my unjustified apprehension and confinement through the utilization of the Driver system. This strategy was employed by making false claims about my mother, highlighting a clear misuse of information. This incident occurred immediately after I left building 80, where my intention was to lodge a formal complaint against a  Peace officer. Unfortunately, my attempt to submit my complaint to management was thwarted as I was prevented from doing so.

In a concerning turn of events, the NYPD proceeded to subject me to increased levels of restraint by tightening the handcuffs on my wrists. This escalation in restraint occurred simultaneously with my detention, which happened without any apparent justification or valid reasons. Remarkably, this occurred just before I was expected to return to my residence after a trip.

Essentially, the conduct of the NYPD indicates a troubling pattern, where my experience was marred by discriminatory treatment and an arbitrary exercise of authority. This incident serves as a stark reminder of the necessity for accountability, transparency, and equitable treatment within law enforcement operations.

Morningside Gardens not only denied me the opportunity to file a complaint against the peace

officials but also of various types of victims of the pandemic. This occurred outside of the building complex and a Black Freeman. These events transpired on October 1, 2021 - October 5, 2021

Morningside Heights Housing Corporation (MHHC) retaliated against me for my attempt to file a complaint. An alarming incident unfolded when the New York Police Department (NYPD) seemingly collaborated with MHHC to openly exhibit discriminatory behavior in front of Building 70. This display was captured by security cameras, witnessed by the surrounding neighborhood.

Upon my return home on October 5, 2021, after the distressing events had transpired, MHHC continued their harassment. They once again contacted the NYPD as I arrived to retrieve my belongings, utilizing the involvement of Karen Eubanks in this concerning affair.

**Harassment:** A landlord engages in a pattern of harassment or intimidation against a tenant because of their protected characteristics, such as race, religion, or national origin.

**Retaliation:** A tenant files a fair housing complaint against their landlord for discriminatory practices, and in response, the landlord attempts to evict or takes adverse actions against the tenant in retaliation for filing the complaint.

**Advertising Discrimination:** An online listing platform allows property owners to specify that they only want to rent to individuals of a certain race or religion, which is a violation of fair housing laws.

35

**Jury Trial by DEMAND**

182. Plaintiff demands a Bench Trial of all causes of action so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

A. Under the First Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

B. Under the Second Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

C. Under the Third Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

D. Under the Fourth Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

E. Under the Fifth Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

F. Under the Sixth Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

G. Under the Seventh Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

H. Under the Eighth Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus punitive damages and attorney's fees;

I. Under the Ninth Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus attorney's fees; and

36

J. Under the Tenth Count, in the amount of NINE MILLION DOLLARS ($9,000,000.00) plus attorney's fees;

Total 90,000,000,00

K. For costs and disbursements; and

L. Such other and further relief as the Court deems just and proper.

Dated: BLATIMORE MARYLAND

SEPTEMBER 5, 2023

Respectfully submitted,

*Ali Moore*

By: <u>ALI MOORE</u>

2506 OVERLAND AVENUE BALTIMORE MARYLAND

Tel: 9178214909